SIXTH DIVISION
June 30, 2010

No. 1-09-1557

| | | |
|---|---|---|
| ROBERTA KRAMARSKI, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant and Cross-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | |
| | ) | No. 08 CH 00553 |
| THE BOARD OF TRUSTEES OF THE VILLAGE OF | ) | |
| ORLAND PARK POLICE PENSION FUND, | ) | |
| | ) | Honorable Mary K. Rochford, |
| Defendant-Appellee and Cross-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

Plaintiff, Roberta Kramarski, appeals the judgment of the trial court affirming the Village of Orland Park Police Pension Fund Board of Trustees (Board). The Board denied her application for a line-of-duty disability pension under section 3-114.1 of the Illinois Pension Code (Code) (40 ILCS 5/3-114.1 (West 2002)). She contends that the Board's decision is against the manifest weight of the evidence. She argues that the evidence established she was injured in the line of duty and is disabled as a result. She also contends that she did not receive a fair and impartial hearing because two pension board members should have recused themselves.

The Board cross-appeals the trial court's reversal of the Board' denial of a not-on-duty disability pension under section 3-114.2 of the Code (40 ILCS 5/3-114.2 (West 2002)). We confirm the decisions of the Board.

1-09-1557

On January 20, 2003, plaintiff filed an application with the Board for a line-of-duty disability pension, or alternatively, a not-on-duty disability pension under sections 3-114.1 and 3-114.2 of the Code. 40 ILCS 5/3-114.1, 3-114.2 (West 2002). The Board held four hearings on her application.

Plaintiff filed a motion to recuse Board members Dargan and Bianchi. The motion was argued on July 11, 2007. Plaintiff alleged that because Bianchi was named in the pleadings in an earlier sexual harassment lawsuit filed by plaintiff against the Village of Orland Park (Village), he would be biased against plaintiff. While no specific allegations were directed at Dargan in the earlier lawsuit, plaintiff alleged that he was one of the officers who created a hostile work environment for her. Plaintiff's counsel stated at the hearing that the lawsuit had been settled. Neither the Village nor Bianchi admitted liability and Bianchi paid no monetary damages. Counsel did not know if Bianchi was ever disciplined. Bianchi and Dargan declined to recuse themselves.

The Board reconvened on August 27, 2007. A fifth Board member, Nash, was added to the administrative panel at plaintiff's request.

Plaintiff testified that she was appointed as an officer with the Orland Park police department in May 1996. On October 17, 1996, she underwent police baton training with 8 to 10 other officers under the instruction of Officers William Kinsella and Edward Hozzian. Hozzian acted as an attacker during the training while plaintiff defended herself with a foam training baton. She testified that Hozzian struck her in the face with his fists and feet, injuring her eye and nose and causing her head to snap back multiple times during a two-minute drill. After the drill,

2

plaintiff felt intense shooting pain in her neck. She also felt tired and stiff. Plaintiff called in sick for her shift that night, explaining that she had not recovered from the training. She stated that she had never felt this type of neck pain before. She subsequently completed her training and the 18-month probationary period for new officers.

Plaintiff further testified that she sought medical treatment for her injuries on November 11, 1996, with Dr. J.E. Rocke because she was dropping things and had difficulty performing her duties. She filled out an injury report and worker's compensation claim on December 6, 1996. She was referred to Palos Primary Care Center. The Center released her to return to work with a light duty restriction.

Plaintiff testified that she sought treatment over the next three years from a variety of doctors to reduce the physical symptoms caused by her injuries. She underwent various examinations, physical therapy, trigger point injections and a facet block procedure. In November 1999, she underwent cervical fusion surgery because of severe pain.

Plaintiff testified that she continues to experience excruciating pain and stiffness in her neck and weakness in her left arm. She continues to receive treatment for her physical injuries and does not believe she can return to work as a police officer because of the limited range of motion in her neck, upper body weakness and numbing of her left arm and hand.

Plaintiff also testified that she began regular psychiatric treatment with Dr. Chris Johnson in 2000. She claimed she suffers from post-traumatic stress disorder (PTSD) and depression due to the injuries she suffered during the 1996 training drill. At the time of the hearing, she was taking a drug for anxiety and as a sleep aid.

Officer Hozzian testified that he was an instructor at the October 16, 1996, police baton training. Hozzian wore a "red man suit," which covered him in padding from head to toe. Hozzian engaged trainees using controlled punches and kicks with about 25% force. Hozzian denied that he punched or kicked plaintiff in the face. He could not recall her head snapping back or that he struck her nose or right eye. He testified that nothing unusual happened during plaintiff's training. He could not remember physical contact with her. He testified that if she had been injured, he would have been required to contact the fire department under department policy. Plaintiff went through the full baton training session with Hozzian and never said she was injured. At the end of the class, Hozzian asked if everyone was all right, and everybody, including plaintiff, said they were okay. Hozzian learned a week later from Sergeant Kinsella that plaintiff said she was injured. Hozzian admitted he received a February 11, 1997, memorandum from Lieutenant Doll, advising training instructors that two student officers had been injured and that strong physical contact was not practical for the training. Hozzian testified that there had been no violent contact with trainees, and he was never disciplined as a result of the memorandum.

Sergeant Kinsella testified that he also was an instructor during the baton training. He saw Hozzian engage in three drills with plaintiff where Hozzian made mild contact with her in the form of a "spin back fist." Kinsella did not see plaintiff injured or a report that she was injured. Kinsella called an ambulance for another trainee who injured his finger on the same date. When Kinsella called plaintiff a few days later as a "wellness" check, she reported she was tired but feeling "pretty good." She did not report being injured. Kinsella also saw Lieutenant Doll's memorandum but denied violent physical contact between instructors and students. He testified

4

he was not disciplined as a result of the memorandum.

The medical reports of Drs. Daniel Yohanna, Alexander E. Obolsky and Richard P. Harris, who examined plaintiff at the Board's request about her alleged psychiatric disabilities, were admitted into evidence. Dr. Yohanna did not observe symptoms of PTSD or depression and, based on his review of plaintiff's medical records, concluded that she did not suffer from a psychiatric disability. Yohanna noted that there were no objective signs and symptoms to justify the diagnosis. He concluded that plaintiff was exaggerating her symptoms and malingering.

Dr. Obolsky found that plaintiff did not suffer from PTSD or depression based on plaintiff's medical, work and legal records, the results of various tests and an interview. Obolsky noted that plaintiff's diagnosis was based on a self-report and that the training incident was neither objectively nor subjectively sufficient to trigger PTSD. Obolsky concluded that plaintiff did not suffer from a psychiatric disability.

Dr. Harris, however, found that plaintiff was psychologically disabled based on an interview and review of plaintiff's medical records. He said plaintiff had credibility problems. He stated that it was possible she lied about the training incident. But, he concluded that plaintiff's decision to undergo cervical fusion surgery supported her credibility. Harris noted that plaintiff believed she had been continuously mistreated and attacked and that she engaged in self-defeating behaviors. While plaintiff did not meet the criteria Harris typically uses to find disability, he concluded that plaintiff would "not be able to function effectively in her current psychological-physical state."

Plaintiff was examined at the Board's request for physical disability by Drs. Charles

5

Mercier, James W. Milgram and Sami Rosenblatt. She was also examined by her doctor, Jeffrey E. Coe. The doctors' reports were admitted into evidence. Mercier found after an exam and review of her medical records that plaintiff was not physically disabled. Mercier appears to have based his opinion, in part, on a belief that plaintiff had neck problems that occurred before she was hired. But the record does not support this. Mercier stated that plaintiff recovered from her alleged October 1996 injury by February 1997. Her subsequent medical care for her neck problem was not related to the training incident. Mercier noted that plaintiff's cervical fusion was stable, her wounds were well healed and, except for subjective decreased range of motion, her neck examination was normal.

Dr. Milgrim concluded that plaintiff was physically disabled based on his examination of plaintiff and her medical records. Milgrim found that the cervical fusion surgery rendered plaintiff disabled because it decreased her range of motion and increased the "possibility of *** future disability" should she be involved in a fight.

Dr. Rosenblatt concluded that plaintiff was physically disabled based on his examination of plaintiff and her medical records. Rosenblatt found plaintiff's cervical range of motion to be limited. Dr. Rosenblatt concluded she was not suitable for return to active duty.

Dr. Coe concluded after a physical examination that plaintiff was physically disabled. Coe's examination revealed a decreased range of motion of the cervical spine in flexion, extension, bilateral rotation and bending. Coe found that plaintiff required permanent work restriction to "the medium physical demand level with avoidance of overhead activities."

Plaintiff's records reveal that she first sought treatment for neck pain with Dr. Rocke on

November 11, 1996. Plaintiff reported that she had been injured in training. Rocke stated that plaintiff had cervical spasms extending into her trapezius. On December 6, 1996, plaintiff was diagnosed with cervical radiculopathy by Dr. Diab, who examined her in connection with her worker's compensation claim. Diab released plaintiff with light duty restrictions and referred her to Dr. Mochizuki. On December 19, 1996, plaintiff was examined by Dr. Yen at the request of the Village. Yen diagnosed plaintiff with bicep tendinitis of the left shoulder and noted that the X ray of her shoulder and neck revealed essentially normal bone and joint findings. Yen released plaintiff to work at full duty without restrictions. Mochizuki first saw plaintiff on January 8, 1997, and diagnosed her with either myofascial pain or a left radiculopathy. Mochizuki permitted plaintiff to return to work without restrictions. Mochizuki reported that an EMG and MRI produced "near normal" results.

On January 14, 1997, plaintiff completed a cervical spine evaluation at Palos Community Hospital, where she reported suffering from headaches, stiffness, weakness, numbness and tingling. Dr. Mochizuki reexamined plaintiff on February 17, 1997, and reported that her condition continued to improve and she had no difficulty at work. On October 17, 1997, Mochizuki diagnosed plaintiff with residual myofascial pain and recommended a trigger point injection and physical therapy. In November 1997, plaintiff underwent an evaluation with Dr. Joel M. Press. Dr. Press diagnosed plaintiff with a probable chronic left C5-C6 facet irritation, secondary myofascial pain syndrome and degenerative disk changes in the cervical spine. Plaintiff continued physical therapy until March 1998. On March 16, 1998, plaintiff returned to Press, who recommended facet injections. Dr. Jeffrey Katz gave the injection on April 29, 1998, but

7

noted that he did not believe further facet injections would help. Katz's records note objective symptoms of decreased flexion and rotation.

Plaintiff was examined by Dr. Terrence Moisan on January 24, 1999, at the request of the police department. Moisan noted a mild degree of cervical muscle spasm but stated that it appeared plaintiff was voluntarily tensing her muscles. In November 1999, Dr. Phillips performed a three-level cervical discectomy and fusion. Phillips had recommended more conservative measures, but plaintiff elected to have the surgery.

On August 21, 2000, plaintiff underwent a functional capacity evaluation (FCE). The FCE revealed significant limitations in her cervical spine range of motion. The evaluator found several essential duties of a police officer plaintiff would not be able to perform. On February 27, 2001, plaintiff underwent a second FCE which showed improvement over the first FCE, although the evaluator concluded that plaintiff could not return to duty as a police officer. On March 13, 2001, after reviewing the FCE, Dr. Phillips stated that plaintiff was unable to work as a police officer without restrictions. On June 17, 2002, Phillips stated that plaintiff was doing "reasonably well," and while he believed she could return to work in a limited capacity, Phillips was not convinced that she could return to work in an "active duty capacity." On August 5, 2002, another FCE was conducted. The FCE stated that plaintiff could work at a light-medium level.

On November 1, 2007, the Board denied plaintiff's application for a line-of-duty disability pension and a not-on-duty disability pension by a 3 to 0 vote. Board members Dargan and Bianchi were present but abstained from voting.

On December 21, 2007, the Board issued a written decision denying plaintiff a disability

pension. The Board relied primarily on the medical opinions of Drs. Yohanna, Obolsky and Mercier and plaintiff's medical records. The Board did not give weight to the opinions or conclusions of the physicians who "based their conclusions that [plaintiff] is disabled upon [plaintiff's] subjective complaints as to her limitations." The Board found plaintiff's testimony not credible with regard to both the occurrence of an injury on October 17, 1996, and her physical and psychological complaints.

Following the Board's decision, plaintiff filed a complaint for administrative review. The trial court affirmed the Board's findings that plaintiff was not mentally disabled and was not injured in the line of duty. But the court reversed the Board's finding that plaintiff was not physically disabled and held she was entitled to not-on-duty disability pension benefits.

We first turn to plaintiff's contention that she was denied a fair and impartial hearing because Board members Bianchi and Dargan were biased against her. Plaintiff argues that Bianchi and Dargan should have recused themselves because Bianchi was named in a sexual harassment suit filed by plaintiff against the Village and Dargan was one of the officers who allegedly created a hostile work environment.

In administrative law cases, we review the decision of the administrative agency, not the trial court. Marconi v. Chicago Heights Police Pension Board, 225 Ill. 2d 497, 531, 870 N.E.2d 273 (2007). Our review is limited to the administrative record. 735 ILCS 5/3-110 (West 2008); Robbins v. Board of Trustees of the Carbondale Police Pension Fund, 177 Ill. 2d 533, 538, 687 N.E.2d 39 (1997).

"A mere possibility of prejudice is insufficient to show that a board, or any of its members,

9

was biased." Collura v. Board of Police Commissioners of Village of Itasca, 113 Ill. 2d 361, 370, 498 N.E.2d 1148 (1986), citing Grissom v. Board of Education of Buckley-Loda Community School District No. 8, 75 Ill. 2d 314, 321, 388 N.E.2d 398 (1978). A person claiming bias "must demonstrate that the decision maker is not ' "capable of judging a particular controversy [fairly] on the basis of its own circumstances" ' " and must overcome the presumption that the decision makers are able to judge each particular case objectively and fairly based on the facts. Danko v. Board of Trustees of the City of Harvey Police Pension Board, 240 Ill. App. 3d 633, 641-42, 608 N.E.2d 333 (1992), quoting Grissom, 75 Ill. 2d at 320, quoting Hortonville Joint School District No. 1 v. Hortonville Education Ass'n, 426 U.S. 482, 493, 49 L. Ed. 2d 1, 9, 96 S. Ct. 2308, 2314 (1976). A claimant may show bias or prejudice if a disinterested observer might conclude that the administrative body or its members had in some measure judged the case in advance. Danko, 240 Ill. App. 3d at 642. If one decision maker on an administrative body is not completely disinterested, his participation " ' "infects the action of the whole body and makes it voidable." ' [Citation.]" Danko, 240 Ill. App. 3d at 642.

Here, plaintiff's only evidence of bias is the sexual harassment lawsuit against the Village of Orland Park, settled without a decision on the merits. Without more, plaintiff's claim is unpersuasive.

Plaintiff cites to no case, nor are we aware of one, where abstention on a vote can be read as probative of bias. In contrast, the police chief serving on the Harvey police pension board in Danko made several statements during the hearing that evidenced his bias. Danko, 240 Ill. App. 3d at 643. These statements during the hearing were noted by the court. Danko, 240 Ill. App. 3d

10

at 643.  Nothing comparable appears in the record of this hearing.  We believe plaintiff has failed

to show more than a "mere possibility" that Bianchi and Dargan were biased or that their bias

"infected" the Board's decision.

Next, we address plaintiff's contention that the Board's decision denying her a line-of-duty

disability pension is against the manifest weight of the evidence.  She claims that the record shows

that the injuries of which she complains can be traced to the baton exercise on October 17, 1996.

Section 3-114.1 of the Code states that "[i]f a police officer as the result of sickness,

accident or injury incurred in or resulting from the performance of an act of duty, is found to be

physically or mentally disabled for service in the police department, so as to render necessary his

or her suspension or retirement from the police service," that officer is entitled to a line-of-duty

disability pension.  40 ILCS 5/3-114.1 (West 2002).

The parties agree that this issue is a question of fact, reviewed under a manifest weight of

the evidence standard.  Marconi, 225 Ill. 2d at 532.  " 'An administrative agency decision is

against the manifest weight of the evidence only if the opposite conclusion is clearly evident.' "

Marconi, 225 Ill. 2d at 534, quoting Abrahmson v. Illinois Department of Professional

Regulation, 153 Ill. 2d 76, 88, 606 N.E.2d 1111 (1992).  " '[F]indings and conclusions of the

administrative agency on questions of fact shall be held to be *prima facie* true and correct,' " and

the " 'mere fact that an opposite conclusion is reasonable or that the reviewing court might have

ruled differently will not justify reversal of the administrative findings.' "  Marconi, 225 Ill. 2d at

534, quoting 735 ILCS 5/3-110 (West 2002), and Abrahmson, 153 Ill. 2d at 88.  "If the record

contains *evidence* to support the agency's decision, that decision should be affirmed."  (Emphasis

11

added.) Marconi, 225 Ill. 2d at 534.

The Board concluded that plaintiff was not injured during the October 17, 1996, police baton training after weighing the testimony of plaintiff, Officer Hozzian and Sergeant Kinsella. The Board stated that it was giving no weight to plaintiff's testimony because at least three of the doctors who examined her on behalf of the Board found she was "not believable." This finding is within the province of the Board, and it is not our function to reevaluate witness credibility or resolve conflicting evidence. Marconi, 225 Ill. 2d at 540. Under the guidelines set out in Marconi, we confirm the Board's decision to deny plaintiff a line-of-duty disability pension.

Finally, we address whether plaintiff is entitled to a not-on-duty disability pension under section 3-114.2 of the Code (40 ILCS 5/3-114.2 (West 2002)). Section 3-114.2 states that a police officer is entitled to a not-on-duty disability pension if he or she "becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service." 40 ILCS 5/3-114.2 (West 2002). Plaintiff urges us to: (1) reverse the trial court judgment affirming the Board's finding that plaintiff is not psychiatrically disabled because the Board's decision was against the manifest weight of the evidence; and (2) affirm the trial court's reversal of the Board's finding that plaintiff is not physically disabled. Defendant cross-appeals the trial court's reversal of the Board's finding that plaintiff was not physically disabled.

As noted, we must confirm the Board's decision "[i]f the record contains evidence to support the agency's decision." Marconi, 225 Ill. 2d at 534, 540. Under this test, the record is clear: it contains evidence to support the Board's finding that plaintiff is neither psychiatrically nor

physically disabled and not entitled to a not-on-duty disability pension under section 3-114.2 of the Code (40 ILCS 5/3-114.2 (West 2002)). The Board found plaintiff was not psychiatrically disabled based on the medical reports of Drs. Yohanna and Obolsky, who concluded that plaintiff did not suffer from a psychiatric disability. Given Yohanna's and Harris's conclusions about plaintiff's veracity, the Board also decided to give no weight to the opinions of physicians who based their conclusions on plaintiff's subjective complaints. Such determinations are within the province of the Board, and it is not our function to reevaluate witness credibility or resolve conflicting evidence. Marconi, 225 Ill. 2d at 540. The Board's decision was not against the manifest weight of the evidence as the record contains evidence supporting the Board's finding that plaintiff was not psychiatrically disabled. Marconi, 225 Ill. 2d at 540.

The Board also found plaintiff was not physically disabled based on the opinion of Dr. Mercier, plaintiff's testimony and plaintiff's medical records. Mercier was the only doctor who examined plaintiff for physical disability on behalf of the Board who concluded that plaintiff was not physically disabled. The trial court reversed the Board's finding on this issue because of Mercier's erroneous belief that plaintiff had received neck treatment before the October 1996 training incident. Plaintiff goes to great lengths in her brief to discredit Mercier's report and the Board's reliance on it. But again, this issue involves the assessment of the credibility of witnesses and the weighing of evidence. The fact that we or the trial court might come to a different conclusion than the Board over the weight to give conflicting evidence cannot justify reversal. Marconi, 225 Ill. 2d at 540. If the record contains evidence supporting the Board's decision that plaintiff is not physically disabled, we must confirm. See Marconi, 225 Ill. 2d at 540.

13

The record contains evidence to support the Board's finding that plaintiff is not physically disabled. In spite of Dr. Mercier's reliance on a belief that plaintiff had pre-existing neck problems, the Board found his report to be the most thorough and thoughtful of the three doctors. Mercier stated in his report that plaintiff had recovered by February 1997 from her alleged October 1996 injury and subsequent medical care for her neck problem was not related to the training incident. After his October 16, 2003, examination of plaintiff, Mercier noted that plaintiff's cervical fusion was stable, her wounds were well healed and, except for subjective decreased range of motion, her neck examination was normal. The Board chose to discount Dr. Milgrim's opinion that plaintiff was disabled because it was premised on the possibility that plaintiff might incur a "future disability" should she someday be in a fight, rather than a current inability to work as a police officer. The Board also found Dr. Rosenblatt's conclusions unpersuasive because they were largely, if not entirely, based on plaintiff's subjective complaints and statements. As discussed above, the Board deemed plaintiff's testimony about her physical disability incredible based on its observations of plaintiff during the hearing and the opinions of at least three physicians. In sum, there was evidence to support the Board's finding that plaintiff was not physically disabled. See Marconi, 225 Ill. 2d at 540.

Plaintiff argues in her reply brief that defendant is attempting to mislead this court by "misconstruing the evidence." Plaintiff overstates the thrust of the Board's brief. To support its case, defendant does discuss plaintiff's medical records and physical status before her application for a disability pension. We find no attempt to mislead the court or misconstrue evidence. Whatever the conflicts in the evidentiary material before the Board here, our traverse of the

record leads us to conclude that there is evidence to support the findings of the Board under the standard set out in Marconi. Marconi, 225 Ill. 2d at 540. We vacate the trial court's reversal of the Board's denial of plaintiff's application for a not-on-duty disability pension. We confirm the judgment of the Board.

Confirmed.

J. GORDON, J., concurs.

R.E. GORDON, J., dissents.

1-09-1557

JUSTICE R.E. GORDON, dissenting:

I must respectfully dissent.

First, we must both enforce the Illinois Pension Code (Code) as written and liberally construe the Code in favor of those to be benefitted. Hahn v. Police Pension Fund, 138 Ill. App. 3d 206, 211 (1985). To properly enforce the Code, we must give the Code its plain and ordinary meaning. People v. Pack, 224 Ill. 2d 144, 147 (2007). Section 3-114.2 of the Code states a police officer is entitled to a not-on-duty disability pension if he or she "becomes disabled as a result of *any cause other than the performance of an act or duty*, and who is found to be physically or mentally disabled so as to *render necessary* his or her suspension or retirement from police service." (Emphasis added.) 40 ILCS 5/3-114.2 (West 2002). Thus, the determination is solely whether plaintiff is physically or mentally disabled and, if so, whether her disablement occurred in the performance of her duties as a police officer or otherwise.

Second, I agree with the majority that the board of trustees' (Board) decision is not against the manifest weight of the evidence that plaintiff was not injured in the line of duty during the October 17, 1996, police baton training session based on the evidence in the record. I do not agree with the majority, nor the Board's finding that plaintiff is not physically disabled so as to render necessary her suspension or retirement from police service. I believe the trial court correctly ruled that the decision of the Board in this regard was against the manifest weight of the evidence.

" 'An administrative agency['s] decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.' " Marconi v. Chicago Heights Police Pension

16

Board, 225 Ill. 2d 497, 534 (2007), quoting Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 88 (1992). "So long as the record contains evidence supporting the agency's decision, that decision should be affirmed." Marconi, 225 Ill. 2d at 540, citing Commonwealth Edison Co. v. Property Tax Appeal Board, 102 Ill. 2d 443, 467 (1984). The majority correctly notes we must confirm the Board's decision if the record contains evidence to support its decision, and as Marconi instructed, the manifest weight of the evidence standard is a "very high threshold to surmount." Marconi, 225 Ill. 2d at 540. Our review of the Board's decision, however, must not amount to a mere rubber stamp of the Board's proceedings merely because the Board heard witnesses, reviewed records and made findings. Bowlin v. Murphysboro Firefighters Pension Board of Trustees, 368 Ill. App. 3d 205, 211 (2006); Brown Shoe Co. v. Gordon, 405 Ill. 384, 392 (1950); Drezner v. Civil Service Comm'n, 398 Ill. 219, 231 (1947). Furthermore, a reviewing court will not hesitate to grant relief where the record does not show evidentiary support for the agency's determination. Bowlin, 368 Ill. App. 3d at 211.

As such, we must examine, and not merely rubber stamp, the Board's decision and ascertain whether the Board was permittedly "weighing the evidence," as the majority asserts, or whether an opposite finding is clearly evident. Slip op. at 13. In finding that plaintiff was not physically disabled, the Board relied entirely on the opinion of one physician, Dr. Charles Mercier, an orthopedic surgeon, whose written report contained erroneous assumptions, inherent contradictions, and focused almost entirely on plaintiff's medical history prior to her cervical fusion surgery. Two other physicians who examined plaintiff found her to be physically disabled, as did her treating physician, so as to make her unsuitable for return to active duty as a police

officer. The majority concludes that the trial court reversed the Board's finding of no physical disability because of Dr. Mercier's "erroneous belief that plaintiff had received neck treatment before the October 1996 training incident." Slip op. at 13. Indeed, there are numerous incorrect mentions of a preexisting injury in Dr. Mercier's report, but the trial court found other inconsistencies with Dr. Mercier's report. Also, the Board improperly relied on Dr. Mercier's conclusions that had no medical basis. I review the medical findings of the three physicians that were authorized to examine plaintiff by the Board and the treating physician in coming to my conclusion.

Dr. James W. Milgram, a board-certified orthopedic surgeon at Northwestern Hospital in Chicago, performed a clinical examination of plaintiff on October 17, 2003, on the instruction of the Board. He reviewed plaintiff's medical records, X-rays, and the various medical reports in her file. He found a solid anterior cervical fusion at three levels with bone grafts at all three levels. He questioned the need for the fusion to cover such a vast area. He found that as a result of this vast fused area, plaintiff has no cervical spine, and that the forces of the neck are transmitted to the disc above and below the fused area. Plaintiff's examination revealed restricted flexion and extension of the neck with only partial rotation. Dr. Milgram further found "that there is increased hazard of her having symptomatology above or below her fusion segment" from necessary police work. He described fights as causing further future disability and opined based on these objective findings that she was disabled for police work with a lifting restriction of 50 pounds. After receiving Dr. Milgram's medical report in evidence, the Board dissected and read out of context the words "future disability" and disregarded the report, stating "[t]he Pension

Board cannot find the plaintiff disabled based on a fear, concern, assumption or guess." Dr. Milgram specifically referred to plaintiff's current "disability" in a preceding paragraph and suggested further disability may occur if she were to return to police duty. The Board rejected Dr. Milgram's report based on a mistaken interpretation of his findings. Dr. Milgram was merely telling the Board that common police work would cause future disability that would add to the disability she already had incurred.

The Board further rejected the findings of Dr. Sam S. Rosenblatt, a board-certified neurosurgeon at Northwestern, who conducted an independent clinical examination of plaintiff on June 7, 2004, at the Board's direction. The Board rejected Dr. Rosenblatt's opinions because he prepared a "cursory two (2) page report." However, the only report it relied on was authored by Dr. Charles Mercier, and his report pertaining to his findings after spinal fusion surgery spans less than two pages. The Board also claims Dr. Rosenblatt simply accepted the plaintiff's subjective complaints at face value and certified the plaintiff disabled. As the trial judge noted in her well-written, lengthy decision, the Board's justification conveniently ignored that Dr. Rosenblatt reviewed the X-rays and other diagnostic tests taken after the spinal fusion, which offered clear objective evidence as to the basis for his opinion that plaintiff was "significantly disabled" and not suitable for return to active duty as a police officer. Dr. Rosenblatt is the only physician who rendered a medical report that actually put down his measurements that supported his opinions as to the restrictive nature of plaintiff's neck. He found her flexion at a mere 10 degrees and extension at 25 degrees, rotation to the right at 25 degrees and to the left at 35 degrees. He further found her lateral bending of her head restricted to 25 degrees to each side. He also found

19

no right tricep reflex. Dr. Rosenblatt's opinions are hardly subjective findings.

The treating doctor, Dr. Phillips, performed the anterior cervical fusion on November 7, 1999, fusing C3-C4 through C5-C6. Dr. Phillips recommended a functional capacity evaluation at the Veterans Administration (VA) and the examiner opined that plaintiff could not return to work. On March 13, 2001, Dr. Phillips found limitation in plaintiff's range of motion, found limitation of lifting to 50 pounds, and prescribed no overhead lifting and no excessive twisting of the neck. An additional functional capacity evaluation was conducted on August 5, 2002, and the examiner again opined that plaintiff could not return to work. Her weight lifting was reduced to 40 pounds, and Dr. Phillips suggested that the positions she uses for twisting and stooping be decreased or eliminated through the use of proper body mechanics. Dr. Phillips found plaintiff disabled for work return as a police officer based on his objective findings and the findings of the functional capacity evaluation.

The only physician of the three who examined plaintiff on behalf of the Board who disagreed that plaintiff was disabled to be a police officer was Dr. Charles Mercier. Dr. Mercier found strength and motion limitations but opined without any basis whatsoever "I am sure with some work hardening/work conditioning, any strength and motion limitations could be resolved allowing this patient to return [to] work as a full-time police officer." Dr. Mercier's report does not show any basis for his opinions or findings. He examined plaintiff on October 16, 2003, found a 50% reduction in flexion and extension, and then made a conclusion of "not disabled" on the physician's certificate without any basis whatsoever and never mentioned disability or the lack of it in his written report. Further, Dr. Mercier's report makes numerous mentions of a pre-existing

neck injury. However, as the trial court notes, there is no evidence in the record of a preexisting neck injury, and Dr. Mercier was mistaken regarding the existence of preexisting neck injury.

Furthermore, the vast majority of the medical history in Dr. Mercier's report, which the Board found to be "the most thorough and thoughtful analysis," was prior to plaintiff's November 1999 cervical fusion surgery. Defendant argues the cervical fusion surgery was an "unnecessary and unjustified" operation, and the majority notes "subsequent medical care for her neck problem [including the cervical fusion surgery] was not related to the training incident." Slip op. at 14. Again, a plain and ordinary reading of section 3-114.2 allows a not-on-duty disability pension for a person "disabled as a result of *any cause* other than the performance of an act or duty." (Emphasis added.) 40 ILCS 5/3-114.2 (West 2002). As such, the soundness of plaintiff's decision to undergo spinal fusion surgery or the relatedness to the training incident is immaterial to the analysis. As the trial court noted, "Although there were questions raised as to the necessity of the surgery, the fusion is an undeniable medical fact." The report concludes with a short postoperative timeline, which mentions a VA functional capacity evaluation that plaintiff underwent in February of 2001 and then notes, "The examiner stated that the patient could not return to work as a police officer." The report then mentions a March 2001 examination by plaintiff's treating physician, Dr. Phillips, and states, "Dr. Phillips also stated that the patient could not return to work as a police officer." As aforementioned, Dr. Mercier's report concludes with, "I am sure with some work hardening/work conditioning, any strength and motion limitations could be resolved allowing this patient to return to work as a full-time police officer." As the trial court noted, there is no further medical explanation or basis as to *why* Dr. Mercier believes he is

"sure" further rehabilitation will cure plaintiff's disablement or *why* he disagrees with plaintiff's treating physician, the VA functional capacity evaluation of February 2001, and every other doctor who examined plaintiff.

"An expert's opinion is only as valid as the basis and reasons for the opinion." Wilson v. Bell Fuels, Inc., 214 Ill. App. 3d 868, 875 (1991), citing McCormick v. Maplehurst Winter Sports, Ltd., 166 Ill. App. 3d 93, 100 (1988). "When there is no factual support for an expert's conclusions, the conclusions alone do not create a question of fact." Gyllin v. College Craft Enterprises, Ltd., 260 Ill. App. 3d 707, 715 (1994). This court has held that the opinions offered by a party's experts lacked a sufficient factual basis and were therefore based on conjecture. Aguilera v. Mount Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 976 (1997). Arbitrary and untenable reasons for denying a pension will not be tolerated. Bowlin, 368 Ill. App. 3d at 212. "Although the manifest evidence standard is a high hurdle, it still does not relieve the appellate court of 'its duty to examine the evidence in an impartial manner and to set aside an order unsupported in fact.' " Boom Town Saloon, Inc. v. City of Chicago, 384 Ill. App. 3d 27, 32 (2008), quoting Leong v. Village of Schaumburg, 194 Ill. App. 3d 60, 65 (1990); Amigo's Inn, Inc. v. License Appeal Comm'n, 354 Ill. App. 3d 959, 967 (2004).

Our Fifth District in Bowlin held a firefighter board's reliance on one doctor's inherently contradictory conclusion that the plaintiff firefighter was not disabled to be against the manifest weight of the evidence given that the other two examining doctors and treating physicians all found the plaintiff to be disabled. Bowlin, 368 Ill. App. 3d at 212. In the case at bar, I see little difference. Dr. Mercier has provided no basis for his opinion that plaintiff is not physically

disabled, his report is contradictory, and the Board has offered no medical evidence to justify his position. Drs. Milgram and Rosenblatt provided a medical basis in finding their opinions that plaintiff was disabled, and plaintiff's treating physician, Dr. Phillips, concurs. The Board gave more weight to Dr. Mercier's report because of its "detailed summary" of plaintiff's health history. The Board found Dr. Mercier's conclusions to be better explained and reasoned, but there was no explanation and reasoning. The "detailed summary" of plaintiff's health history was a history that was mostly prior to plaintiff's surgery. Dr. Mercier never cleared plaintiff for active duty nor did he ever say that she could return to work. He merely concluded that she "would be able to return" with work hardening and conditioning, which conflicts with his opinion that she is not disabled. Marconi set a "very high threshold to surmount" but plaintiff has surmounted this threshold. Marconi, 225 Ill. 2d at 540. I agree with the trial court that the Board's decision to deny plaintiff benefits is against the manifest weight of the evidence.

For these reasons, I cannot agree with the majority.